## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IDA CERVANTES,

        **Plaintiff,**

        **v.**

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

        **Defendant.**

**No. 12 C 6381**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Ida Cervantes filed this action seeking review of the final decision of the Defendant Commissioner of Social Security denying her application for Supplemental Security Income (SSI) under the Social Security Act. 42 U.S.C. § 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Plaintiff has filed a motion for summary judgment requesting the Court to remand the Commissioner's decision. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Social Security Act.[2] *See Elder v. Astrue*, 529 F.3d 408, 409–10 (7th

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

Cir. 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least twelve months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). The claimant bears the burden of proof through Step 4, but at Step 5 the burden shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Cervantes applied for SSI on April 3, 2009, alleging that she had become disabled on November 1, 2008.[3] (R. at 171). This application was denied initially and upon reconsideration, after which Cervantes filed a timely request for a hearing.[4] (R. at 25, 131, 137). An Administrative Law Judge (ALJ) conducted a hearing on October 21, 2010, during which Cervantes testified and was represented by counsel. (R. at 25, 41). The ALJ also heard testimony from Larry M. Kravitz, Psy.D., a medical expert and Thomas A. Gusloff, a vocational expert. (R. at 25, 41, 170). Cervantes's attorney provided an opening statement. (R. at 46–48).

The ALJ denied Cervantes's request for SSI on November 19, 2010. (R. at 36). Applying the five-step sequential evaluation process, the ALJ found, at Step 1, that Cervantes had not engaged in substantial gainful activity since April 3, 2009, the application date. (R. at 27). At Step 2, the ALJ found that Cervantes had the severe impairments of status post-left ankle fracture and repair, diabetes, and depression. (*Id).* At Step 3, the ALJ determined that Cervantes did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (R. at 27–31).

---

[3] On the SSI Application Summary prepared by the Commissioner, Plaintiff's onset date is listed as April 1, 2009. (R. at 171). However, this appears to be a clerical error. (*Cf. id.* at 25, 122, 128, 158, 174, 195).

[4] Cervantes also applied for DIB on April 3, 2009 (R. at 191), but the DIB application was denied shortly thereafter because her insured status lapsed prior to her alleged onset date (*id.* at 174). "In order to be entitled to DIB, an individual must establish that the disability arose while he or she was insured for benefits." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 348 (7th Cir. 2005). The date last insured requirement does not apply to SSI claims. *Compare* 20 C.F.R. § 404.131 *with id.* § 416.202.

The ALJ then assessed Cervantes's residual functional capacity ("RFC") and determined that she had the RFC to perform sedentary work, as defined in 20 C.F.R. § 416.967(a), with the following limitations:

> The claimant can lift no more than a maximum of 10 pounds at a time; occasionally lift and/or carry articles like docket files, ledgers, and small tools; stand/walk for a total of no more than 2 hours in a normal 8-hour workday; and sit for a total of 6 hours in a normal 8-hour workday subject to postural limitations of never climbing ladders, ropes, or scaffolds, occasionally climbing stairs or ramps, occasionally balance using a hand-held assistive device, and occasionally stoop, kneel, crouch, or crawl; a manipulative limitation[] of frequently handling of objects bilaterally; an environmental limitation to avoid concentrated exposure to wetness; and subject to the limitations of performing unskilled work that require simple, routine, and repetitive tasks . . . performed in isolation [in a] stable work environment that does not have production or pace requirements and that requires only occasional contact with supervisors, co-workers, and the public.

(R. at 31). At Step 4, the ALJ determined that Cervantes was unable to perform any past relevant work. (R. at 34). At Step 5, based upon Cervantes's age, education, work experience, and RFC, the ALJ determined that there were jobs existing in significant numbers in the national economy that Cervantes could perform. (R. at 35). Accordingly, the ALJ concluded that Cervantes was not disabled, as defined by the Social Security Act, since April 3, 2009, the application date. (R. at 35–36).

On April 10, 2012, the Appeals Council denied Cervantes's request for review. (R. at 6–11). Cervantes now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by section 205(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal quotations and citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at

1002 (internal quotations and citation omitted). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL AND VOCATIONAL EVIDENCE

Cervantes was born on December 27, 1968 and was forty years old when she filed for SSI. (R. at 171). At the time of the hearing, she possessed an eighth-grade education. (R. at 84). Between 1993 and 2000, she held various jobs in the housekeeping and manufacturing industries. (R. at 84, 210). As of the hearing, Cervantes lived in a first-floor apartment and said that she was able to drive her automobile several times each week. (R. at 62–63). She also testified that she was the primary caretaker for her two young children. (R. at 76). Cervantes's disability purportedly results from a variety of physical and mental impairments including diabetes, depression, intermittent explosive disorder, left ankle pain, carpal tunnel syndrome, and pain on the left side of her body. (R. at 33, 46–48, 199).

### A. Physical Impairments

#### 1. Pre-hearing Medical Evidence

In 1992, Cervantes underwent surgery for a fractured left ankle and subsequently began experiencing pain in the ankle. (R. at 46, 63, 725). The pain intensified in 1998 and by 2005, it had spread to the last three left toes, the lateral aspects of her left foot, calf, and thigh, her left buttock, and her lower back. (R. at 725). In addition, Cervantes has had diabetes since at least 2004. (R. at 28).

In 2005, Cervantes underwent an MRI, which showed a heel spur and tibio-talar osteoarthritis. (R. at 725). She was referred to a pain clinic, which provided her with a "CAM Walker," a cane, and prescriptions for pain medication. (*Id*). On December 30, 2008, Cervantes was diagnosed with "[c]alcaneal spur causing chronic heel pain" as well as "sensory neuropathy of L5+S1 over the 4th and 5th digits of the left foot." (R. at 292).

On May 21, 2009, Dilip Patel, M.D., examined Cervantes on behalf of the Commissioner, noting the left ankle surgical scar. (R. at 297–301). Dr. Patel also stated that Cervantes suffered "moderate pain on weightbearing," as well as "reduced range of movements and tenderness on the area." (*Id*). As for her back, Cervantes had "mild" stiffness and discomfort, as well as "slightly reduced range of movements." (*Id*). Dr. Patel also commented about Cervantes's "abnormal" gait, noting that she was unable to walk more than fifty feet without the use of a cane. (R. at 300–01). Dr. Patel observed that her hand grips were fine and that she was able to write, open a jar, and turn a doorknob. (R. at 301).

At an April 15, 2010 appointment, Cervantes reported that she had no feeling in her two right fingers due to inflammation. (R. at 515). Subsequently, on April 24, 2010, Cervantes was admitted to Adventist GlenOaks Hospital, where she complained of pain in her left arm with tingling in her left fourth and fifth fingers. (R. at 588). She stated that the pain had persisted for three weeks. (R. at 588).

On May 5, 2010, Cervantes underwent a consultation at RLT Neurologic Associates. (R. at 545). There, she was described as having a "one-month history of

pain and numbness in the left arm." (*Id*). The pain started at the base of her neck on the left side and was radiating down her arm. (*Id*). She also complained of paresthesias, weakness in her left hand, and elbow pain. (*Id*). She felt that her walking was a "little slower" but denied weakness or numbness "in the lowers." (*Id*). The consultant, Daniel F. O'Reilly, M.D., reported that Cervantes had a "fairly good range of motion of her neck." (*Id*). Dr. O'Reilly found that she had the symptoms of left C7-8 radiculopathy and that the exam was "remarkable for a sensory polyneuropathy most likely from diabetes." (R. at 546).

Dr. O'Reilly ordered an MRI, which found small disc herniations at C4-C5 through C6-C7. (R. at 550). The herniations indented the thecal sac but did not cause significant spinal stenosis or cord compression. (*Id*). The MRI also showed mild narrowing of the left C3-C4 neural foramen, which "appear[ed] to be related to uncovertebral joint osteophyte." (*Id*). But the MRI report noted that Cervantes's described symptoms did "not appear to correlate with the left C4 nerve dermatome" and, thus, the significance of the narrowing was unclear. (R. at 550–51).

A neurodiagnostic report dated June 3, 2010 noted that Cervantes showed electrophysiologic evidence of (1) median mononeuropathy with entrapment at wrist (carpal tunnel syndrome); and (2) left-sided motor ulnar neuropathy across the elbow. (R. at 481, 547).

### 2. Cervantes's Hearing Testimony

At the hearing, Cervantes testified that she "constantly" had pain from her left ankle that radiated up her left leg and into her lower back. (R. at 65, 95). As a

result, she said, doctors sought to give her "injections" to alleviate the pain. (R. at 65). She had refused, however, due to her belief that past injections had been ineffective and had caused fleeting benefits. (*Id*). Cervantes was prescribed a cane in either 2004 or 2005. (R. at 63–64). She kept the cane with her while in her car and used it to move around her home, but she did not use it all of the time. (R. at 64). Even with her cane, she could only stand comfortably for less than a half hour at a time. (R. at 72). In order to alleviate swelling, she needed to elevate both of her legs about three times per day. (*Id*). She would then keep them elevated for up to one hour, and the elevation entailed putting her legs "straight to where" she was sitting. (R. at 73, 94–95).

Cervantes also testified that she experienced numbness and tingling on her left side and in her left hand. (R. at 67–69). She said that her right wrist was "worse" because she had no "strength" with it. (R. at 68–69).

Cervantes testified that she was receiving treatment for her diabetes. (R. at 66). Originally, she mostly took pills, but she had received insulin during her pregnancy. (*Id*). She believed that diabetes had caused problems with her vision, but she was free of cataracts, glaucoma, and bleeding in her eyes. (R. at 74).

As far as her daily activities, Cervantes testified that she went to church twice a month but needed to stand up during the service. (R. at 80–81). She also said that she was becoming uncomfortable during the hearing itself. (R. at 81). Cervantes testified that she was "rarely" able to pick up her baby. (R. at 70). She stated that she was unable to grip a doorknob or open a jar and that "constantly things are just

slipping and falling." (*Id*). She said that she was unable to carry ten pounds but could carry a gallon of milk without slipping. (R. at 71). She also said that she was able to button her clothes. (R. at 70).

Cervantes testified that she took a variety of medications, but she was unable to remember their names, aside from Ibuprofen 800. (R. at 64–65). She cited several side effects of those medications, including stomach pains, dizziness, and bleariness. (*Id*).

### 3. *Consultative Evidence*

On June 23, 2009, Virgilio Pilapil, M.D., a Disability Determination Services (DDS) consultant, completed a physical RFC assessment of Cervantes. (R. at 321–28). Dr. Pilapil opined that Cervantes was limited in that she could (1) occasionally lift only twenty pounds; (2) frequently lift only ten pounds; and (3) stand/walk for a total of at least two hours during an eight-hour workday. (R. at 322). Furthermore, Dr. Pilapil found that Cervantes could sit for a total of six hours in an eight-hour workday and had an "unlimited" ability to push/pull. (*Id*). Dr. Pilapil also found that, while Cervantes had normal range of motion at her right ankle, her left ankle was "15/20 dorsiflexion, 15/40 plantar flexion." (*Id*). She also had a calcaneal spur that caused "chronic heel pain," and she experienced "moderate pain on weightbearing." (*Id*). Cervantes's gait was abnormal, and she was unable to heel toe walk, squat, or, at times, ambulate without a cane. (*Id.*). However, her motor system was normal. (*Id*).

Due to pain and limited range of motion in her ankle, Dr. Pilapil noted that Cervantes was only "occasionally" able to climb ramps or stairs and was "never" able to climb ladders, ropes, or scaffolds. (R. at 323). Otherwise, Cervantes was "frequently" able to balance, stoop, kneel, crouch, and crawl. (*Id)*. She also had no manipulative, visual, communicative, or environmental limitations. (R. at 324–25). Consistent with his findings, Dr. Pilapil found Cervantes's statements of limitations only partially credible. (R. at 326).

### 4. Post-hearing Medical Evidence

On October 9, 2011—after the ALJ decision and hearing—Cervantes underwent another set of MRIs. (R. at 788–97). The MRI of her left shoulder joint showed (1) mild degenerative rotator cuff tendinopathy; (2) large, chronic, multi-component labral tear in her shoulder; (3) degenerative osteoarthritis of her left shoulder joint; (4) mild inflammatory arthropathy of the left AC joint; and (5) mild rotator interval synovitis. (R. at 793).

## B. Mental Impairments[5]

### 1. Pre-hearing Medical Evidence

On February 16, 2009, Kavita Shah, M.D., performed a psychiatric evaluation of Cervantes. (R. at 276–86). Dr. Shah noted that Cervantes had reported not "be[ing] herself" since injuring her ankle in 1992, instead feeling depressed, helpless, and stressed. (R. at 282). Dr. Shah noted that Cervantes had a sad and irritable affect

---

[5] Although Plaintiff does not appeal the ALJ's handling of her mental impairments in the RFC, the Court will briefly describe those impairments.

and an anxious mood. (R. at 284). Cervantes had only "fair" insight, but her thought content was seemingly normal. (R. at 284–85).

Throughout 2009, Cervantes underwent a series of mental health evaluations at the DuPage County Health Department. (R. at 413–50). She was diagnosed with moderate, recurrent depressive disorder and intermittent explosive disorder. (R. at 420). Cervantes reported problems such as anger, having a quick temper, conflicting with others, and acting out on impulse. (R. at 414, 416, 420). Further, she said that she had feelings of paranoia, auditory hallucinations, and thoughts of suicide. (*Id*). Health Department evaluations indicated that Cervantes's memory, concentration, thought process, and problem-solving ability were each impaired. (R. at 424–25).

In 2009 and 2010, Cervantes was treated at the Transitional Services Center. (R. at 487–540). A note dated October 14, 2009, indicated that Cervantes was taking Zoloft and that her mood and sleep were "okay." (R. at 488). On March 3, 2010, she reported hopelessness and suicidal thinking, but she said that she would not act on them. (R. at 506). At a follow-up appointment on April 15, 2010, she stated that she was "overwhelmed with her children and her health problems." (R. at 515). Treatment notes from June 21, 2010 indicated that Cervantes's symptoms had improved somewhat. (R. at 523–24).

### 2. *Cervantes's Hearing Testimony*

At the hearing, Cervantes said that she had been receiving treatment for depression and irritability for "probably" over one year. (R. at 74). She also saw both a therapist and a psychiatrist every four to six weeks. (R. at 74–75).

At one point, it had been recommended that Cervantes be hospitalized for depression. (R. at 75–76). However, she had refused to go because she was pregnant at the time and she was the only person able to take care of her then-six-year-old daughter. (*Id*). In addition, Cervantes had suffered from auditory hallucinations, although they had not manifested after some of her medications had changed. (R. at 76).

Cervantes stated that on a typical day she would wake up at 7:30 AM and "scream[] and yell[]" at her eldest daughter to get ready for school. (R. at 83). She had sleeping difficulties and was only able to sleep for five to six hours each night. (R. at 76). At the hearing, she was unsure about whether her sleeping issues were due to her physical or mental problems. (*Id*). She said that she often felt "frustrated" by otherwise normal events and would "start screaming . . . yelling," and throwing objects around her home. (R. at 89–90).

Cervantes testified that she was able to cook small meals for her children and tried her best to do their laundry and prepare their meals. (R. at 76, 78–79). Further, she would occasionally take her eldest daughter to and from school. (R. at 77–78).

Cervantes stated that she did not have any friends. (R. at 79). She also said that she had not liked being around coworkers because they distracted her. (R. at 80).

### 3. *Consultative Evidence*

On June 15, 2009, DDS consultant Erika Altman, Ph.D., completed a mental RFC assessment of Cervantes. (R. at 317–20). Dr. Altman concluded that Cervantes

was "moderately limited" with respect to (1) her ability to understand and remember detailed instructions; (2) her ability to carry out detailed instructions; (3) her ability to maintain attention and concentration for extended periods; and (4) her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id*).

### 4. Medical Expert's Hearing Testimony

The medical expert (ME) gave his medical opinion of Cervantes during the hearing. He testified that she had major depressive disorder and an intermittent explosive disorder. (R. at 50). He stated that, although her mental impairments did not meet or equal any regulatory "listing," he would expect them to result in functional limitations. (R. at 50–51). He testified that Cervantes was capable of understanding and remembering simple and detailed instructions. (R. at 51). However, she would have difficulty carrying out detailed instructions on a sustained basis. (*Id*).

The ME stated that Cervantes's primary difficulty would involve interpersonal relationships, but she did have the ability to mostly "maintain some level of control." (R. at 52). In sum, the ME would put Cervantes in a routine work environment, one in which she could perform tasks "relatively independently with minimal dependence on others." (R. at 54).

## C. Vocational Testimony

At the hearing, the ALJ asked the vocational expert ("VE") a series of hypothetical questions. (R. at 100). For each question, the VE was to assume that

the hypothetical facts pertained to a person of Cervantes's age, relevant work history, and education. (*Id*). For the first hypothetical, the ALJ inquired into the jobs available to someone who would be capable of lifting up to twenty pounds occasionally, lifting and carrying up to ten pounds frequently, standing and walking for about two hours in an eight-hour workday, and sitting for up to six hours in an eight-hour workday. (*Id*). Further, the person could occasionally climb ramps or stairs but could never climb ladders, ropes, or scaffolds. (*Id*). Other postural limitations of the hypothetical person would be "at the frequent level." (*Id*). In addition, the hypothetical person would be capable of performing simple, routine, and repetitive tasks. (R. at 101). The VE testified that this person would be incapable of performing Cervantes's past relevant work but could nonetheless perform several "sedentary and unskilled" jobs. (*Id*).

For the second hypothetical, the ALJ instructed the VE that the hypothetical person would possess all of the limitations described in the first hypothetical but could only occasionally stoop, kneel, crouch, or crawl. (R. at 101–02). Further, the person's balance would require the occasional use of an assistive device and, as a result, the person should not have "exposed concentration" to a slippery work environment and would not be able to operate "foot controls." (R. at 102). Moreover, the person would be limited to only occasional interaction with the public and coworkers and would be unable to perform "tandem tasks." (*Id*). The person's work would need to be isolated with only occasional supervision. (*Id*). The VE testified

that this person could perform the same jobs identified in response to the first hypothetical. (R. at 102–03).

For the third hypothetical, the ALJ advised the VE that the hypothetical person would possess all of the limitations described in the second hypothetical but would also be limited to "frequent handling."[6] (R. at 104). The VE testified that this person would still be able perform the jobs identified in response to the first hypothetical because those jobs required, at a *minimum*, frequent handling. (*Id*).

However, in response to a fourth hypothetical, the VE testified that a person would be incapable of working if she were limited to "occasional handling" in addition to the aforementioned limitations. (R. at 104–05). Finally, in response to a fifth hypothetical, the VE testified that a person would be incapable of working if she were required to elevate her legs three times per workday. (R. at 105).

## V. DISCUSSION

Cervantes raises three arguments in support of her request for reversal or remand: (1) the ALJ's adverse credibility finding defies meaningful review; (2) the ALJ's RFC assessment failed to consider all of Cervantes's impairments; and (3) the Appeals Council should have considered new and material evidence.[7] (Dkt. 17 at 1).

---

[6] The *Dictionary of Occupational Titles* considers it a limitation when one is restricted to "frequently" engaging in an activity. *Dictionary of Occupational Titles Appendix C*, http://www.occupationalinfo.org/appendxc_1.html; *see Hulsey v. Astrue*, 622 F.3d 917, 924 (8th Cir. 2010). "Frequently" is defined as one-third to two-thirds of the time, whereas "constantly" is defined as more than two-thirds of the time. *See id*.

[7] In light of the remand, the Plaintiff's argument that the Appeals Counsel should have considered new evidence is moot.

## A. The ALJ's Credibility Finding

First, Cervantes argues that the ALJ's adverse credibility finding was in error. (Dkt. 17 at 12–13). When a claimant alleges subjective symptoms, the ALJ evaluates the credibility of those allegations. Social Security Ruling (SSR)[8] 96-7p. An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). This Court has noted that "[d]emonstrating that a credibility determination is patently wrong 'is a high burden.'" *See Mueller v. Astrue*, 860 F. Supp. 2d 615, 631 (N.D. Ill. 2012) (quoting *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010)).

However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003) (quoting *Zurawski v. Halter*, 245 F.3d 881, 887–88 (7th Cir. 2001)). But because an ALJ is in the best position to observe witnesses, her credibility finding will not be

---

[8] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

overturned if it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178–79 (7th Cir. 2001).

Further, when assessing the credibility of an individual's statements about symptoms, an ALJ must consider the evidence in light of the entire case record. *See* SSR 96-7p. "This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." *Id.* The ALJ must consider the "individual's daily activities" and the "location, duration, frequency, and intensity of the individual's . . . symptoms." *Id.* Similarly, where the individual attends a hearing conducted by an ALJ, the ALJ may also consider his or her own observations of the individual. *Id.*

In this case, the ALJ found Cervantes to be only "partially credible." (R. at 34). In particular, the ALJ noted:

> After careful consideration of the evidence, I find that the claimant is not persuasive, the objective evidence not supporting the extent of the claimant's alleged inability to perform work. The claimant's allegation of disability relies primarily on her testimony of a history of pain in her left ankle, but the evidence does not adequately support that allegation. This is not to suggest that the claimant has not experienced pain, but there is no evidence indicating the pain would interfere with her ability to perform work. For example, the claimant testified that she was able to do many of her household chores unaided and provided accommodations to herself such as doing less work at any one time or preparing enough food when cooking to allow for leftovers.
>
> There is also the issue of the claimant's testimony, which if not lacking in veracity appears to lack in consistency. For example, the claimant testified that [she] needed to elevate her legs straight out to reduce swelling, but there is no[] support for this in the evidence.

> Additionally, the claimant stated that she drives to the store and drives to pick her daughter up from school. She also testified that she no longer picked up her infant daughter because the child could walk and because she now weighed more than the claimant could comfortably lift. However, I find this testimony suspect as it appears reasonable that the claimant would do some lifting of her youngest daughter, for instance, if only to put her in and take her out of the car seat when the claimant drives.

(R. at 33).

Although the ALJ gave some weight to Cervantes's testimony, the Court finds that the ALJ's reasons for discrediting Cervantes's credibility were not legally sufficient or supported by substantial evidence. First, the ALJ based her decision, in part, on Cervantes's testimony about her activities of daily living, emphasizing that Cervantes was able to "do many of her household chores unaided and provided accommodations to herself such as doing less work at any one time . . . ." (R. at 33).

While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly instructed that ALJs are not to place "undue weight" on those activities. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace"); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the

analysis "must be done with care." *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

In this case, the ALJ did not adequately explain how Cervantes's ability to perform limited cooking, driving, and laundering evinced an ability to perform full-time work. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Cervantes merely testified that she was able to perform some domestic chores, and, even then, her ability to complete those tasks was hampered. The ALJ noted that Cervantes gave "accommodations to herself such as doing less work at any one time." (R. at 33). Similarly, Cervantes testified that she used a cane to move around her home and occasionally asked another person to accompany her to the grocery store. (R. at 63–64, 72, 77).

While the nature of personal activities is such that one can often readily attain accommodations, the modern workplace is far less forgiving. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer."). Moreover, because of Cervantes's documented mental impairments and workplace difficulties, the inherent differences between daily living and full-time work are even more pronounced in the instant case. Accordingly, the ALJ should have better

developed her explanation of how Cervantes's ability to perform daily tasks supported a finding that she had the ability to work.

In addition, the ALJ found Cervantes incredible because her testimony "appear[ed] to lack . . . consistency." (R. at 33). SSR 96-7p indicates that the "consistency" of a claimant's statements is a "strong indication of . . . [her] credibility. But "consistency" may take several forms in a social security case. According to SSR 96-7p, an ALJ must consider the "degree to which the individual's statements are consistent with the medical" evidence, the "consistency of the individual's own statements," and the "consistency of the individual's statements with other information in the case record."

In this case, the ALJ's use of the term "consistency" was so ambiguous and perfunctory as to prevent meaningful review. It is not entirely clear to the Court how the ALJ formed its consistency finding. The ALJ did cite Cervantes's alleged need to elevate her legs, stating that the allegation lacked support from the record. (R. at 33). However, the Court does not know whether the ALJ also intended to find that Cervantes's testimony was internally inconsistent—the ALJ did not comment on this aspect of consistency. *See* SSR 96-7p.

The Court's review of the transcript indicates that Cervantes's own description of her symptoms was largely consistent. However, because the ALJ made only the general statement that Cervantes's testimony lacked "consistency"—and because the ALJ provided little to no accompanying elaboration—the ALJ's reasons for discrediting Cervantes were not "'sufficiently specific to make clear to [a] . . .

subsequent reviewer[] the weight'" given to Cervantes' testimony and the reasons for that weight. *See Lopez*, 336 F.3d at 539–40 (quoting *Zurawski*, 245 F.3d at 887–88). Because the ALJ used the perceived lack of consistency to justify the credibility finding, the ALJ should have provided a clearer, more thorough analysis of this point.

The ALJ apparently found Cervantes's testimony inconsistent because (1) Cervantes's need to elevate her legs was not supported by the evidence; and (2) the ALJ found "suspect" her statement that she was unable to lift up her daughter. (R. at 33). As to the first rationale, the ALJ should have provided more explanation than the single sentence contained in the decision. *See Zurawski*, 245 F.3d at 887. On remand, the ALJ will have an opportunity to better explain why Cervantes' purported need to elevate her legs justified a finding that she was not credible. However, we briefly note here that a claimant's allegations of pain may not be disregarded "solely" because they are unsubstantiated by the objective evidence. SSR 96-7p; *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[The ALJ] cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony.")

However, the more troubling aspect of the ALJ's credibility determination was her treatment of Cervantes's professed inability to pick up her youngest daughter. Cervantes testified that she was the primary caregiver for both of her children and that she did her "best" to take care of their laundry and meals. (R. at 76). She said she drove her automobile several times each week. (R. at 62–63). At

the time of the hearing, Cervantes's youngest daughter was only fifteen months old. (R. at 62). The ALJ labeled the testimony "suspect," speculating that Cervantes was nevertheless lifting her daughter from time to time. (R. at 33).

This type of speculation did not constitute "substantial evidence," *cf. Moss*, 555 F.3d at 560–61, nor did it provide an "accurate and logical bridge from the evidence" to the conclusion, *see Young*, 362 F.3d at 1002. The ALJ never observed Cervantes interacting with her family. At the very least, the ALJ should have directly raised her theories at the hearing. Then, Cervantes would have had an opportunity to rebut or explain the purported inconsistencies. *See generally Zurawski*, 245 F.3d at 887 ("'[An ALJ must] investigate all avenues presented that relate to pain . . . .'") (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).

In sum, the ALJ's explanation was legally insufficient to conclude that Cervantes lacked credibility. While we do not hold that the ALJ should have found Cervantes credible, the foundation underlying the credibility assessment was inadequate. On remand, the ALJ should fully and clearly explain her credibility finding, relying on proper bases and supplying satisfactory rationale.

## B. The ALJ's Assessment of Cervantes's RFC

Next, Cervantes argues that the ALJ's RFC assessment failed to account for all of her impairments. (Dkt. 17 at 9). In a social security case, RFC refers to the "work-related activities [that] the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000–01; SSR 96-8p ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including

any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC "must be assessed based on all the relevant evidence in the record." *Young*, 362 F.3d at 1001; *see* 20 C.F.R. § 416.945(a)(1). Further, in determining a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano*, 556 F.3d at 563.

In this case, because we remand the ALJ's credibility determination, *see supra*, we must remand the RFC determination as well. A claimant's credibility forms an integral part of the Step-4 RFC analysis. *See* SSR 96-8p; SSR 96-7p. And, due to the possibility that Cervantes's RFC might differ on remand, we will not extensively comment on the current RFC finding. Nevertheless, we note several problematic issues in the interest of preventing their recurrence on remand.

As an initial matter, the parties' briefs reflect, in their treatment of RFC, potential confusion between the terms "neuropathy," "polyneuropathy," "mononeuropathy," and "carpal tunnel syndrome." On remand, the parties should strive to avoid misunderstandings involving these concepts. As we understand it, the term "neuropathy" refers to an abnormal and usually degenerative state of the nervous system or nerves.[9] Neuropathies often result from diabetes, and they can

---

[9] *See* Merriam-Webster's Medical Dictionary 457 (1995).

occur throughout the body.[10] "Polyneuropathy" refers to a neuropathy that affects multiple nerves, while "mononeuropathy" refers to a neuropathy that affects only one nerve or nerve group.[11] "Carpal tunnel syndrome" is an example of a mononeuropathy.[12]

Further, the ALJ cited to a neurodiagnostic report dated June 3, 2010, noting that the report "did not indicate [that] the claimant experienced diabetic polyneuropathy." (R. at 29, 481). The report stated that Cervantes had both carpal tunnel syndrome—"median mononeuropathy with entrapment at wrist"—and "left-sided motor ulnar neuropathy across the elbow." (R. at 481). Although the report did not specifically use the term "diabetes," a neuropathy can nevertheless result from this disease.[13] In no place did the report indicate that Cervantes's neuropathies were *not* the result of diabetes. On the contrary, because Cervantes's diabetes dated back to at least 2004, someone who viewed the 2010 report in context could rationally infer that the neuropathies did, in fact, result from the disease.

---

[10] *See Diabetic Neuropathies: The Nerve Damage of Diabetes*, U.S. Dep't of Health and Human Servs., http://diabetes.niddk.nih.gov/dm/pubs/neuropathies/ (last visited Jan. 29, 2014) [hereinafter *Diabetic Neuropathies*].

[11] *About Peripheral Neuropathy - What is Peripheral Neuropathy?*, Center for Peripheral Neuropathy, Univ. of Chi., http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/aboutpn/whatispn/polyvsmono.shtml (last visited Jan. 28, 2014).

[12] *Id.* Carpal tunnel syndrome is also considered a "compression neuropathy" because of the way it affects the nerves of the wrist. *See* Encyclopedia of Disability and Rehabilitation 489–90 (1995). As with other neuropathies, carpal tunnel syndrome can, but does not necessarily, result from diabetes. *See Types of Peripheral Neuropathy – Compression*, Center for Peripheral Neuropathy, Univ. of Chi., http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/typesofpn/compression/carpaltunnel.shtml (last visited Jan. 28, 2014).

[13] *See Diabetic Neuropathies*, *supra* note 10.

When the ALJ considers Cervantes's RFC on remand, the ALJ should more clearly identify each neuropathy she addresses in the decision. As described *supra*, the ALJ should also properly reassess Cervantes's credibility. Additionally, we urge the ALJ to more explicitly and specifically describe the extent to which Cervantes's diabetes factors into the RFC assessment.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [16] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R :

Dated: March 24, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge